# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

UNITED STATES OF AMERICA        CASE NO.  3:24-CR-00269-01

VERSUS        JUDGE TERRY A. DOUGHTY

DEMORION BAKER        MAG. JUDGE KAYLA D. MCCLUSKY

## REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, is a Motion to Suppress Evidence and Request for Franks Hearing filed by Defendant Demorion Baker.  [doc. #31].  The motion is opposed.  [doc. #37].  For the reasons stated below, **IT IS RECOMMENDED** that the motion be **DENIED**.

## Background

On April 23, 2024, agents with the Drug Enforcement Administration ("DEA"), Monroe Narcotics Unit ("MNU"), and Louisiana State Police ("LSP") executed a federal arrest and search warrant on James Nelson ("Nelson").  [doc. #37].  A search of Nelson's residence yielded (1) five pounds of methamphetamine; (2) two pounds of marijuana; (3) a handgun; and (4) a large amount of cash.  *Id.* at p. 1.  Nelson was then transported to a holding facility where he was interviewed after being advised of his *Miranda* rights.  *Id.* at pp. 1-2.

During the interview, Nelson stated there was only one current local source of methamphetamine.  *Id.* at p. 2.  He reported that, on April 22, 2024—the day before his arrest—he purchased four pounds of methamphetamine for $ 8,000 from a black male known as "Duck" at a

residence near his own.  *Id.*  Prior to Nelson's arrest, on April 11, 2024, agents had placed a court-ordered GPS tracker on his vehicle.  *Id.*  Agents independently verified that, on April 22, 2024, Nelson traveled to the 300 block of Morton Street.  *Id.*  When shown photographs of homes in that area, Nelson identified 304 Morton Street as the location where he met "Duck."  *Id.*  Nelson was then shown a photograph of Defendant Demorion Baker ("Baker") and confirmed that Baker was "Duck."  *Id.*

Agents subsequently sought and obtained a search warrant for 304 Morton Street.  *Id.*  In the warrant affidavit, Agent Ryan Mahoney stated:

> On 4/23/2024 MNU and DEA Agents arrested a methamphetamine trafficker on a Federal Arrest Warrant. Agents then executed a Federal Search Warrant at the target's house which yielded over 5 lbs of methamphetamine, 1 lb of marijuana, and a firearm. The target was given the benefit of Miranda and interviewed. The target stated that he/she purchased 4 lbs of methamphetamine from [ ] a male named "Duck" who lived close[] to the target. Agents placed a court-ordered GPS tracker on the target's vehicle weeks prior. GPS location data from 04/22/2024 showed that the target went to 304 Morton St at approximately 1648 hours. 304 Morton St is seven blocks from the target's home. The target was shown a photo of 304 Morton St and confirmed that was the location where he bought the methamphetamine from "Duck."
>
> Your Affiant respectfully requests a narcotic search warrant for 304 Morton St. due to the recent information from a high level methamphetamine trafficker which can be corroborated by Agents from the GPS location data. This search warrant is in relation to the violations of RS40:967.A.1 (Distribution of CDS II Methamphetamine).

*Id.*

A state court judge of the Fourth Judicial District Court signed the search warrant.  *Id.* at p. 3; [doc. #31, p. 2].  Upon executing the warrant, agents recovered "84.32 pounds of Marijuana, 2.4 pounds of methamphetamine, 1.07 kilograms of powder cocaine, .96 pounds of crack cocaine, 1225 pills (methamphetamine), and 400 Xanax pills" from 304 Morton Street.  [doc. #37, p. 3].

Baker is charged with (1) possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii); (2) possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii); (3) possession with intent to distribute base cocaine (crack) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(iii); (4) possession with intent to distribute schedule IV (alprazolam) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(2); (5) possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D); and (6) possession of firearms in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A).  [doc. #18].

On May 8, 2025, Baker filed a Motion to Suppress Evidence and Request for Franks Hearing.  [doc. #31].  He contends that the warrant affidavit contained false statements and material omissions essential to the probable cause determination.  *Id.* at p. 2.  Further, the warrant affidavit failed to corroborate the alleged criminal activity attributed to Baker.  *Id.*  Baker denies selling anything to Nelson and claims he does not own the residence at 304 Morton Street.  *Id.* at p. 3.  Nevertheless, he also refers to the property as "his home" and asserts a "reasonable expectation of privacy."  *Id.* at p. 1.

Baker asserts that the warrant affidavit lacks independent evidence linking him to the alleged drug transaction or establishing that Nelson went to 304 Morton Street to purchase narcotics.  *Id.* at p. 3.  The warrant affidavit fails to disclose the identity, relationship, or reliability of the informant and does not mention who resides at 304 Motion Street.  *Id.* at pp. 4-5.  According to Baker, "[b]y failing to properly identify and characterize the sources of information, the affiant made it impossible to evaluate the existence of probable cause."  *Id.* at p. 4.  He further argues that the affidavit's discussion of GPS data is a "false claim," asserting the data does not show Nelson at either 304 or 306 Morton Street.  *Id.*  Baker asks the Court to suppress "all physical evidence,

whether tangible or intangible, and any other tangible or intangible evidence obtained directly or indirectly from search of his home located [at] 304 Morton Street, Monroe, LA 71201." *Id.* at p. 1.

On May 14, 2025, the Government filed an opposition to the motion. [doc. #37]. First, it argues that Baker has not established standing to challenge the contents of the search warrant, as he denied owning the property and has not demonstrated any alternative privacy interest. *Id.* at pp. 3-4. The Government asserts that Baker cannot simultaneously disclaim connection to the residence while claiming a privacy interest in it. *Id.* at p. 4.

Second, the Government contends that a signed warrant and affidavit are presumed valid, and Baker has not rebutted that presumption. *Id.* at p. 5. His denial of the drug sale and of property ownership is unsupported by any offer of proof. *Id.* at p. 6. The Government maintains that Nelson's statements were corroborated: Nelson informed agents that he purchased narcotics from Baker, traveled to the 300 block of Morton Street, identified both the residence and Baker, and confirmed the location where the transaction occurred. *Id.*

The Government further argues that Baker misunderstands the GPS tracking data. *Id.* at p. 7. Nelson's statement about travelling from Dilling/South 5th Street to 304 Morton Street is consistent with GPS "pings," including timestamps supporting that route. *Id.* at p. 8. The Government concludes that Baker has not shown the existence of any false statement and requests that the Court deny the motion. *Id.* at p. 9.

A hearing on the Motion to Suppress Evidence was held on May 20, 2025, and June 20, 2025. On June 25, 2025, Baker filed his Post-Hearing Brief. [doc. #48]. Baker contends that Nelson only provided the name "Duck" when being questioned because law enforcement

encouraged him to cooperate by offering him the possibility of leniency. *Id.* at p. 2. Also, law enforcement had Nelson's girlfriend detained at the time of his interview. *Id.* Baker argues that the search warrant affidavit for 304 Morton Street "lacked probable cause because it did not establish a 'nexus' between his home and any criminal activity" and "was so lacking in probable cause because it was based on an unreliable informant and inaccurate GPS location data used as corroboration." *Id.* The information provided by Nelson lacked detail, internal consistency, or corroborating evidence such as controlled buys, surveillance footage, or witness statements. *Id.* at p. 4. Further, Baker maintains that Mahoney could not verify the reliability of Nelson's statement because Mahoney did not see the transaction, knew the GPS location data was inaccurate, and did not even knew the correct time of day the transaction allegedly occurred. *Id.*

Since Mahoney manipulated facts in the affidavit, the statements in the warrant affidavit were misrepresentations. *Id.* Nelson also cannot be considered a reliable informant as he has never worked with law enforcement before, and his information was not corroborated by any independent evidence. *Id.* at p. 5. Nelson did not know the street name where the alleged drug transaction occurred even after living in the area for over fifteen years. *Id.* at p. 6. Further, the GPS data location is only forty-to-seventy-percent accurate, so it cannot corroborate Nelson's statements. *Id.* at p. 7. Finally, the warrant affidavit failed to state that Nelson also purchased methamphetamine from Texas and that Nelson made several stops on April 22, 2024. *Id.*

On June 27, 2025, the Government filed its opposition to Baker's Post-Hearing Brief. [doc. #49]. The Government argues that there is a clear nexus that established 304 Morton Street as the location where the narcotics were sold to Nelson as the GPS data supported this conclusion. *Id.* at p. 3. Agents testified that the GPS data may not guarantee an exact location, but it still accurately reflects a person's general location. *Id.* at p. 8. Nelson was also able to select the home from an

array of photographs, and he identified Baker as "Duck." *Id.* at pp. 5-7. Further, Baker does not meet his burden to show either a deliberate misstatement or a reckless disregard of the truth in the affidavit. *Id.* at p. 4. Nelson's statements were also corroborated with how recent the methamphetamine purchase had occurred. *Id.* at p. 5. While Nelson had gone to Texas to buy drugs previously, he only bought marijuana, not methamphetamine. *Id.* at p. 6. The Government maintains that the motion to suppress should be denied. *Id.* at p. 10.

Accordingly, the matter is ripe.

## **Relevant Testimony and Documentary Evidence**

The hearing took place on May 20, 2025, and June 20, 2025. During the hearing, the Government called three witnesses: Eldridge Ryan Mahoney, Andrew Laiche, and Megan Russell. The defense did not call any witnesses. The Government and defense attached evidence to their filings, but no evidence was formally offered or admitted during the hearing. The Court will confine its consideration to the exhibits attached to the written submissions and the testimony shared during the hearing.

The Court summarizes the relevant testimony and evidence as follows:

The Government's first witness was Eldridge Ryan Mahoney ("Mahoney") of the Monroe Police Department ("MPD"). Mahoney has served with MPD for approximately twenty-two years and is currently assigned to the MNU. With twenty-four years of experience as a law enforcement officer, Mahoney routinely makes credibility determinations when interviewing witnesses, victims, and those accused of crimes. Mahoney began an investigation into James Nelson ("Nelson"), also known as "Papa," which lasted approximately three months.

As a result of that investigation, a search warrant was acquired, and Nelson was arrested subsequent to the search of his residence.  At his residence, among other things, officers recovered five pounds of methamphetamine.  After his arrest, Nelson was taken to an interview room to be questioned, and he was informed of his *Miranda* rights.  Nelson admitted against his own self-interest that four of the five pounds of methamphetamine in his possession had been purchased from a man known as "Duck" the day before his arrest.

Prior to Nelson's arrest, Mahoney placed a federally court-ordered GPS tracker on his vehicle.  The GPS tracker provides pings which indicate the approximate location of the vehicle.  These pings range between forty to eighty percent reliability.  Nelson's vehicle pinged around the 300 block of Morton Street on the day before his arrest.  The GPS data independently verified to Mahoney the information that Nelson had provided.  During his interview, Nelson also positively verified, through photographs, the house and the individual he bought the methamphetamine from.  Nelson identified Baker as the man who sold to him.  After reviewing photographs of multiple houses, Nelson identified 304 Morton Street to be the house he bought the methamphetamine from.  This house is owned by Baker's mother.  He also recognized Baker's vehicle in a photograph in front of the house next door to 304 Morton Street.

Following this interview, Mahoney obtained a search warrant for the house located at 304 Morton Street.  The search yielded approximately ninety pounds of marijuana, a kilo of cocaine, a pound of crack cocaine, several pills, multiple firearms, and multiple pounds of methamphetamine.  The house contained no beds.  Baker's cellphone and laptop were found inside.  Prior to Nelson's interview, Mahoney had not been investigating Baker and had no prior involvement with him.

Defense counsel presented an excel spreadsheet that showed Nelson's location throughout the day on April 22, 2024, between 4:17 p.m. and 4:51 p.m.  [doc. #31-2].  The spreadsheet also

shows whether Nelson's vehicle was stopped or moving.  Mahoney explained that the GPS tracker cannot keep pinging the same spot, so it will jump around.  That is why multiple addresses near 304 Morton Street are listed as Nelson's locations.  The GPS tracker also lists addresses that do not exist, but if a user can click on the preview and obtain latitude/longitude coordinates.  Mahoney admittedly made a mistake by listing Nelson was at 304 Morton Street at 16:48 in the search warrant affidavit, but it appears that Nelson was at that house at 16:45.  There is also a discrepancy with whether the house's address is 304 or 306 Morton Street, but the Monroe system indicates that the address is 304.

The Government presented a map layout of the neighborhood displayed the multiple pings that occurred on April 22, 2024.  [doc. #37, p. 8].  Multiple pins placed Nelson at the approximate location of his driveway and home, and Morton Street is just a few blocks away.  Mahoney stated that these pins corroborated Nelson's statement that he bought methamphetamine from a man named Duck just a few blocks from his home.

For its second witness, the Government called Agent Andrew Laiche ("Agent Laiche"), a special agent with the Drug Enforcement Administration ("DEA").  Agent Laiche has been with the DEA for four years.  While working on Nelson's case, Agent Laiche was informed that one of Nelson's sources of supply was Baker.  A GPS tracker was attached to Nelson's vehicle, and that tracking information was also used in Baker's case.  Agent Laiche testified that there is a large excel spreadsheet that contains Nelson's every location that was pinged by the GPS tracker.  The smaller spreadsheet presented during the hearing was a condensed list that was filtered to just show Nelson's locations on April 22, 2024.  With his ten years of law enforcement, Agent Laiche testified that the GPS tracker data corroborated Nelson's statements of buying methamphetamine a few blocks down the road, and he found Nelson to be a reliable source.  While Nelson made multiple

stops on April 22, 2024, Agent Laiche gave his opinion, based on the evidence, that Nelson did, in fact, stop at Morton Street and noted that there is no evidence to suggest Nelson received the four pounds of methamphetamine from any other source.

Nelson's post-arrest interview, conducted by Agent Laiche, was recorded up until Nelson began to provide credible, actionable information about an individual. At that point, Agent Laiche explained that Nelson would be treated as a confidential source, and his identity would need to be protected. Before disclosing this information, Nelson was informed that cooperation could potentially result in favorable treatment at sentencing. During the unrecorded portion of the interview, Nelson identified the house where he purchased methamphetamine by selecting it from a group of photographs depicting various houses on the same street. He also identified Baker, through a photograph, as the person who sold him the methamphetamine. Nelson confirmed that Baker's car had been parked outside the house next door to 304 Morton Street, which belonged to Baker's grandmother. In addition, Nelson provided a phone number for the individual who sold him methamphetamine. A search of local databases confirmed the number belonged to Baker. The address at 304 Morton Street had also been listed in at least three prior police reports in which Baker was named.

Agent Laiche and other MNU agents knew the Morton Street house to be a stash house. The four pounds of methamphetamine recovered from Nelson's home matched the packaging of the methamphetamine recovered from 304 Morton Street. While Nelson had purchased from suppliers in Texas prior to the purchase with Baker, Nelson informed Agent Laiche that one of those suppliers had passed away.

The Government then called its last witness, Megan Russell ("Russell"). Russell has been a task force officer with the DEA for almost eight years. Russell's involvement with Nelson's case

included participating in controlled purchases, and her involvement with Baker included being present during the execution of the Morton Street search warrant.  She stayed at the front door of the 304 Morton Street house with the search warrant return.  Russell saw no beds, couches, televisions, or any other pieces of furniture in the house.

## **Motion to Suppress Standard**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . ." U.S. CONST. amend. IV.  The protections of the Fourth Amendment extend to the states through the Fourteenth Amendment.  *Dunaway v. New York*, 442 U.S. 200, 207 (1979) (citation omitted).  "The proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights."  *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014) (citation and quotation marks omitted).

Evidence obtained in violation of the Fourth Amendment is generally excluded and "'cannot be used in a criminal proceeding against the victim of the illegal search or seizure.'"  *United States v. Wallace*, 885 F.3d 806, 810 (5th Cir. 2018) (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974)).  The purpose of this exclusionary rule is to deter unlawful police conduct.  *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006).  By refusing to admit evidence gained as a result of conduct that deprives the defendant of some right, "the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of the accused."  *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 919 (1984)).

## Discussion

*(a) Standing*

"[A] criminal defendant seeking suppression must show that 'his *own* Fourth Amendment rights [were] infringed by the search [or] seizure which he seeks to challenge." *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) (quoting *Byrd v. United States*, 584 U.S. 395, 403 (2018). This concept is described as one of Fourth Amendment standing, which should not be confused with Article III standing. *United States v. Rodriguez*, 33 F.4th 807, 811 (5th Cir. 2022) (citing *Byrd*, 584 U.S. at 411). "'Fourth Amendment rights are personal[,]' and 'may not be vicariously asserted.'" *United States v. Escamilla*, 852 F.3d 474, 485 (5th Cir. 2017) (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)).

Whether a defendant has standing to contest the validity of a search or seizure depends on two factors: (1) whether he is able to establish an actual, subjective expectation of privacy with respect to the place being searched or items seized and (2) whether that expectation of privacy is "one which society would recognize as reasonable." *Iraheta*, 764 F.3d at 461. "[A] person has no standing to challenge a search or seizure of property that was voluntarily abandoned" or conveyed to another. *United States v. Powell*, 732 F.3d 361, 374 (5th Cir. 2013) (citing *United States v. Alvarez*, 6 F.3d 287, 289 (5th Cir. 1993) (holding defendant lacked standing to object to a search of a garment bag after denying ownership and voluntarily abandoning the bag in a motel room). A defendant who abandons or disclaims ownership of property prior to the search does not have standing to challenge a search subsequent to his abandonment or disclaimer of that property. *Iraheta*, 764 F.3d at 461.

As proponent of a motion to suppress, Baker had the burden of establishing that his own Fourth Amendment rights were violated by the challenged search.  *See United States v. Molina-Garcia*, 634 F.2d 217, 218 (5th Cir. 1981).  Baker has made no attempt whatsoever to assert any interest in the searched house.  He has also failed to establish the requisite legitimate expectation of privacy in the house.

It has been established that Baker's mother owns the house located at 304 Morton Street.  Although the text of the Fourth Amendment suggests that its protections extend only to people in their own houses, the Supreme Court has held that in some circumstances a person may have a legitimate expectation of privacy in someone else's house.  *See Minnesota v. Carter*, 525 U.S. 83, 89 (1998).  One such example is that an overnight guest in a house has an expectation of privacy that the Fourth Amendment protects.  *See Minnesota v. Olson*, 495 U.S. 91, 99-100 (1990).  However, no evidence was presented that Baker was an overnight guest at 304 Morton Street.  Agent testimony stood unrebutted that there was no furniture inside the house.  Baker's only personal items found in the house were his cellphone and laptop.  "[O]ne who is merely present with the consent of the householder may not" claim the protection of the Fourth Amendment.  *Carter*, 525 U.S. at 90.

Baker has presented to the Court no evidence that he had a reasonable expectation of privacy in 304 Morton Street.  "A defendant who fails to demonstrate a sufficiently close connection to the relevant places or objects will not have standing to claim that they were searched or seized illegally." *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991) (quotation omitted).  Baker does not own the house, has presented no evidence of ties to the house, and no personal belongings besides his cellphone and laptop were found in it.  Further, Baker never argues that he ever slept in this house or had any expectation to be treated as an "overnight guest."  In fact, Baker

made no argument or presented no evidence that he had any connection to the house besides his mother owning it. Therefore, the Court finds that Baker does not have standing to challenge the search of 304 Morton Street.

Accordingly, **IT IS RECOMMENDED** that the Motion to Suppress Evidence [doc. #31] be **DENIED**.

*(b) False Statements or Omissions*

Although the Court finds that Baker lacks standing to challenge the search of 304 Morton Street, even if he did have standing, the Court would conclude that the search did not violate the Fourth Amendment.

"There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). In *Franks*, the Supreme Court held an officer violates the Fourth Amendment if he or she deliberately or recklessly provides false information necessary to secure an "arrest" warrant. *Laviage v. Fite*, 47 F.4th 402, 406 (5th Cir. 2022) (citing, *inter alia*, *Franks*, 438 U.S. at 171). Furthermore, a *Franks* violation may occur when an officer makes "knowing and intentional omissions that result in a warrant being issued without probable cause . . ." *Id.* (citation omitted).

In *United States v. Ortega*, the Fifth Circuit recognized that,

> [u]nder the Supreme Court's decision in Franks, a search warrant must be voided if the defendant shows by a preponderance of the evidence that the affidavit supporting the warrant contained a false statement made intentionally or with reckless disregard for the truth and, after setting aside the false statement, the affidavit's remaining content is insufficient to establish probable cause.

854 F.3d 818, 826 (5th Cir. 2017) (citing *Franks*, 438 U.S. at 155-56).

Traditionally, a motion to suppress evidence discovered pursuant to a search warrant is analyzed under a two-step process. *United States v. Sibley*, 448 F.3d 754, 757-58 (5th Cir. 2006) (citation omitted). If the good faith exception applies, then the inquiry ends. *United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) (citation omitted). If the good-faith exception does not apply, then the court must proceed to the second step of the analysis to determine whether the warrant was supported by probable cause. *Id.*

In *Ortega*, however, the Fifth Circuit explained that the Franks inquiry effectively consists of three questions, all of which must be met: "First, does the affidavit contain a false statement? Second, was the false statement made intentionally or with reckless disregard for the truth? And third, if the false statement is excised, does the remaining content in the affidavit fail to establish probable cause?" *Ortega*, 854 F.3d at 826 (internal citations omitted).

Under a *Franks* analysis, "material omissions are treated essentially similar to claims of material misstatements." *United States v. Gonzalez*, No. 5:18-CR-482, 2018 WL 6174202, at *7 (S.D. Tex. Nov. 7, 2018) (citations omitted). Moreover, the defendant must show more than mere "negligence or innocent mistake" by the affiant. *United States v. Ortega*, 719 F. App'x 319, 324 (5th Cir. 2018) ("*Ortega II*") (citations omitted). However, "recklessness may be shown circumstantially 'when reasons to doubt [the] information's veracity are obvious.'" *Id.* at 324 (citations omitted).

Baker contends that the affidavit contains a false statement by indicating that the drug distribution at 304 Morton Street occurred at 4:48 p.m., while GPS data places Nelson at a different location at that time. [doc. #31, p. 4]. Mahoney testified that the correct time of the transaction was 4:45 p.m., but he mistakenly listed it as 4:48 p.m. when drafting the affidavit. This creates a three-minute discrepancy between the affidavit and the GPS records.

14

While the time provided in the affidavit is inaccurate, the Court finds that the misstatement was not made knowingly or with reckless disregard for the truth. "[T]he district court's determination of the affiant's state of mine—whether the affiant was lying intentionally, lying, or merely negligently misstating—is a factual finding . . ." *United States v. Neal*, 182 F. App'x 366, 370 (5th Cir. 2006). Mahoney, while reviewing a large spreadsheet of time-stamped GPS data, inadvertently selected the incorrect time. The discrepancy is minimal and did not mislead the issuing judge or undermine the integrity of the probable cause determination. Whether Nelson was at the residence at 4:45 p.m. or 4:48 p.m. on the date in question is immaterial—the affidavit accurately reflects that Nelson was present at the location on the relevant date, as he reported to law enforcement. The Court concludes that Mahoney did not act with intent to deceive or with reckless disregard for the truth.

The Court need not excise this statement and determine if the remaining content in the affidavit fails to establish probable cause. The statement, while not displaying the correct time, was not made intentionally or with reckless disregard for the truth by Mahoney. Instead, Mahoney simply made an innocent mistake by stating a time that was three minutes off.

Baker also argues that Mahoney purposefully omitted Nelson's identity from the affidavit. [doc. #31, p. 5]. The affidavit refers to Nelson as a "methamphetamine trafficker." [doc. #31-1, p. 3]. It explained that Nelson was arrested and provided a post-arrest statement identifying 304 Morton Street as the place where the methamphetamine distribution occurred. Although Nelson was not named, the affidavit adequately describes the circumstances under which he provided information. "[N]othing is added to law enforcement officials' affidavits by the naming of the informant." *United States v. Phillips*, 727 F.2d 392, 396 (5th Cir. 1984). The Court does not find the failure to name Nelson to be a false statement or a material omission. The affidavit contains

15

sufficient detail about the informant and the basis for his knowledge to allow the issuing judge to assess credibility. Thus, the omission did not mislead the judge or compromise the probable cause determination.

Further, Baker asserts that Mahoney knew "that the GPS location data was inaccurate." [doc. #48, p. 4]. However, there is no evidence to support this claim. Both Mahoney and Agent Laiche testified that, while GPS data may not always provide a precise pinpoint location due to signal bouncing, it reliably reflects a person's general vicinity. In this case, the data placed Nelson in the general area of 304 Morton Street. Multiple GPS pings on April 22, 2024, showed activity near that address. [doc. #37, p. 8]. Therefore, Mahoney's statements in the affidavit do not constitute falsehoods or a reckless disregard for the truth.

Accordingly, even assuming Baker had standing, the Court finds that no *Franks* violation has occurred.

### (c) Probable Cause

"A valid search warrant may be issued only upon a finding of probable cause." *United States v. Brown*, 941 F.2d 1300, 1302 (5th Cir. 1991). A judge need only have a substantial basis for concluding that a search would uncover evidence of wrongdoing. *United States v. Perez*, 484 F.3d 735, 740 (5th Cir. 2007). "[P]robable cause does not demand more than a 'fair probability' on which a reasonable person would act." *United States v. Contreras*, 905 F.3d 853, 858 (5th Cir. 2018) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)). "'[P]robable cause' means something more than 'mere suspicion.' Probable cause requires the existence of facts 'sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed'

and the person to be arrested (or searched) committed it." *United States v. Gordon*, 580 F.2d 827, 832 (5th Cir. 1978) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Information provided by a confidential informant can be considered reliable, depending on (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity, or has instead gone stale." *United States v. Jackson*, 328 F. App'x 933, 935-36 (5th Cir. 2009) (quoting *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007)). "To access the value of a confidential informant's report, [courts] consider his veracity, reliability, and basis of knowledge." *United States v. Gallegos*, 239 F. App'x 890, 894 (5th Cir. 2007) (quotation omitted). Direct personal observation is a sufficient basis of knowledge. *Id.* (quotation omitted).

Here, the Court first considers whether Nelson was a reliable informant. Nelson provided law enforcement with information about a methamphetamine purchase that had occurred the previous day. The transaction involving Baker at 304 Morton Street had taken place less than twenty-four hours before Nelson's arrest and subsequent interview. Nelson personally observed the transaction, as he was directly involved in it. He was able to identify both the house, selecting it from a photo array, and Baker. Nelson also was eventually able to give officers the name of the street where the transaction occurred, which was confirmed by GPS data. Law enforcement had already seized methamphetamine from Nelson at the time of the interview, and Nelson disclosed the source of those drugs during his post-arrest statement. Given the totality of theses circumstances, including Nelson's firsthand involvement and the corroboration by GPS and drug evidence, law enforcement had no reason to doubt the accuracy of this account.

While Baker did inquire into whether Nelson was coerced by law enforcement, there is no evidence that this occurred.  Law enforcement did offer Nelson the possibility of leniency if he spoke to the agents, but it was an offer to share the truth and possibly Nelson could receive leniency.  Baker points to Nelson's girlfriend also being detained as a situation where Nelson spoke just to "save" his girlfriend, but there is no evidence presented by Baker to support this.  It is true she was detained, but there is no proof that law enforcement used the girlfriend's detainment as coercion.  At best, Baker offers speculation about why Nelson stated he bought the drugs from him.  However, speculation, with no proof, is not enough to invalidate Nelson's credibility as an informant.

Because Nelson's statements were credible and corroborated, there was at least a fair probability that drug paraphernalia, specifically methamphetamine, would be found at 304 Morton Street.  The GPS data corroborated the statements made by Nelson.  A man of reasonable caution would surmise from these facts that a search of 304 Morton Street would likely render evidence of drug paraphernalia.  Accordingly, the Court finds that even if Baker did have standing to challenge the warrant, there was sufficient probable cause to support its issuance.

*(d) Nexus*

Baker argues that "[n]o nexus was established between [him] and 304 Morton Street.  [doc. #48, p. 7].  It is well established that an affidavit in support of a search warrant must "'establish a nexus between the house to be searched and the evidence sought.'"  *United States v. Nguyen*, 172 F. App'x 558, 561 (5th Cir. 2006) (quoting *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996)).  The nexus may be established "by direct observation or through normal inferences as to where the articles sought would be located."  *Broussard*, 80 F.3d at 1034.

In this case, law enforcement received information from Nelson, who had just been arrested and found in possession of methamphetamine. Nelson stated that he had purchased the methamphetamine from Baker at 304 Morton Street. Law enforcement already had possession of the methamphetamine Nelson claimed to have purchased from that location. Nelson was also able to identify 304 Morton Street from among several photographs of houses along that street and confirmed that Baker was the individual who sold him the drugs. Nelson's statements were based on his direct observations, and GPS tracking data further corroborated his account that the transaction occurred at 304 Morton Street on April 22, 2024. Accordingly, the Court finds that the search warrant affidavit contained a sufficient nexus between Baker, 304 Morton Street, and the drug paraphernalia sought.

### (e) Good Faith Exception

"Even if the defendant proves that one or more statements in the affidavit are false, and yet fails to prove that the affiant deliberately or recklessly included such false information in the affidavit, the court may consider the entire affidavit—without any excision—under the good faith exception to the exclusionary rule." *United States v. Looney*, 532 F.3d 392, 394 (5th Cir. 2008).

The exclusionary rule requires the suppression of evidence that is seized pursuant to a warrant unsupported by probable cause. *United States v. Pope*, 467 F.3d 912, 916 (5th Cir. 2006) (citation omitted). The Fifth Circuit has recognized that warrants that rely on unlawfully obtained evidence implicate the "good-faith exception." *United States v. Turner*, 125 F.4th 693, 713 (5th Cir. 2025).

When an officer obtains evidence in an "objectively reasonable good-faith reliance" on a search warrant, the exclusionary rule's "deterrence rationale loses much of its force," and the evidence is admissible. *Pope*, 467 F.3d at 916. As the Fifth Circuit explained,

> [t]his is in part because an issuing-judge's probable cause determination, based on an underlying affidavit, is afforded great deference. Of course, such deference is not boundless, but, where the officer's conduct is objectively reasonable, excluding the evidence will not further the ends of the exclusionary rule in any appreciable way. Thus, when an officer acting with objective good faith has obtained a search warrant from a judge . . . and acted within its scope, the officer cannot be expected to question the magistrate's probable cause determination . . .

*Gibbs*, 421 F.3d at 357-58 (internal citations and quotation marks omitted).

In short, "[f]or the good-faith exception to apply, the executing-officer's reliance on the issuing-judge's probable-cause determination and the technical sufficiency of the warrant must have been objectively reasonable." *Id.* at 358 (citation omitted).  The good faith inquiry "'is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" *United States v. Maggitt*, 778 F.2d 1029, 1035 (5th Cir. 1985) (quoting *United States v. Leon*, 468 U.S. 897, n.23 (1984)).  Stated another way, "if it is plainly evident that a magistrate or judge had no business issuing a warrant, then police cannot objectively rely on the warrant." *Id.* (quoted source and internal quotation marks omitted).

Importantly, the good-faith exception asks "not whether the issuing judge made a proper determination of probable cause, but whether the agents reasonably relied on the judge's determination in light of the information set forth in the affidavit." *United States v. Pigrum*, 922 F.2d 249, 252-53 (5th Cir. 1991) (citations omitted).   Ultimately, a reviewing court will defer to an issuing judge's probable cause determination in signing a warrant unless:

(1)    the issuing-judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;

(2)    the issuing-judge wholly abandoned his judicial role in such a manner that no reasonably well trained officer should rely on the warrant;

20

(3)     the underlying affidavit is "bare bones" (so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable); or

(4)     the warrant is so facially deficient . . . that the executing officers cannot reasonably presume it to be valid.

*Gibbs,* 421 F.3d at 358 (citing *United States v. Leon,* 468 U.S. 897, 923 (1984)) (internal quotation marks omitted).

The Government bears the burden of demonstrating that the good-faith exception is applicable. *United States v. Gant*, 759 F.2d 484, 487-488 (5th Cir. 1985).

Here, the only misstatement in the affidavit was a three-minute discrepancy regarding the time Nelson was at 304 Morton Street. This minor inaccuracy does not undermine the validity of the warrant or the officer's reliance on it. Mahoney reasonably relied on the issuing judge's determination of probable cause based on the totality of the information in the affidavit. The affidavit was not supported by bare-bones allegations; rather, it provided specific, detailed facts regarding a recent methamphetamine transaction, based on a firsthand account that was independently corroborated. Nothing in the affidavit was facially deficient, and the issuing judge was not misled. As discussed above, the time discrepancy was neither intentional nor made with reckless disregard for the truth.

Mahoney acted in good faith when he relied on a warrant issued by a neutral and detached judge. His reliance was objectively reasonable, as the affidavit contained detailed, corroborated information and was not facially deficient. Under these circumstances, the good-faith exception to the exclusionary rule applies. Accordingly, even if Baker had standing to challenge the search, the good-faith exception would apply.

**Conclusion**

For the above stated reasons,

**IT IS RECOMMENDED** that the Motion to Suppress Evidence [doc. #31] filed by Defendant Demorion Baker be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FED. R. CIV. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for an extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 3rd day of July, 2024.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE